**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **ARMANDO GARCIA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 15-744 (JEB)** |
| **U.S. CITIZENSHIP AND IMMIGRATION SERVICES,** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

As modernist architect Ludwig Mies van der Rohe once reflected, "It is not possible to go forward while looking back."  Yet that is exactly what Plaintiff Armando Moya Garcia, an alien *émigré* from Cuba, seeks to do here.  He wants this Court to turn back time, not in a literal sense, but in a legal one, so that his quest to remain in this country may go forward.

Garcia came to the U.S. by boat in 1980, and in 1981, while he was a minor living in Florida, his mother applied on his behalf for lawful-permanent-resident (LPR) status with the predecessor agency of what is now U.S. Citizenship and Immigration Services.  After years of waiting without a decision on that application, Garcia filed a second application as an adult in 1990.  Initially successful in obtaining LPR status on that one, he was later ordered deportable, in large part because of a cocaine-trafficking conviction.  He subsequently sought – and was denied – a discretionary waiver from deportation; as a result, he has been under an order of supervision ever since.  Garcia has two goals in bringing this suit: to obtain through the Freedom of Information Act a record of any adjudication of his 1981 application and, barring that, to secure a

reconsideration of his LPR request under the facts and law as they stood in 1981 – before his criminal conviction – so that he may seek another chance at a deportation waiver.

On his FOIA cause of action, the Court ultimately concludes that USCIS has adequately searched – albeit in vain – for a record of a 1981 adjudication. As to his LPR-reconsideration claim, Plaintiff's theory of relief is both too speculative and too spectral to establish that he has standing. It would require the exercise of extraordinary *nunc pro tunc* equitable remedies – ones the Court doubts it has the authority to grant – to bend time in the manner Garcia seeks, rewinding 20 years of changes to immigration laws and 35 years of facts relating to him. As such relief is not warranted here, the Court will grant Defendants' combined Motion for Summary Judgment and Motion to Dismiss.

## I.      Background

Because the relevant parts of Plaintiff's story take place in both the past (his claim for adjustment of status under his 1981 Application for LPR status) and the present (his FOIA inquiry), the Court will recount them separately.

### A.   Adjustment of Status and Order of Deportation

"[O]ur Byzantine immigration laws and administrative regulations are second or third in complexity [only] to the Internal Revenue Code." Santiago v. Holder, 312 F.App'x 867, 868 (9th Cir. 2009) (Pregerson, J., dissenting). The Court's recitation of the background of Plaintiff's case, accordingly, is light on facts but heavy on law.

Plaintiff Armando Garcia Moya is a citizen of Cuba who currently resides in Falls Church, Virginia. See Compl., ¶ 9. Although the parties do not account for his early childhood, on October 19, 1981 – when Plaintiff was nine – his mother filed on his behalf a Form I-485A, an Application by Cuban Refugee for Permanent Residence, with Immigration and

Naturalization Services (INS), the predecessor agency to USCIS.  Id., ¶ 15; see also Notice (ECF No. 13), Exh. 8 (I-485A Application (Oct. 19, 1981)).  Plaintiff's mother appears to have filed his 1981 application in person, and Garcia seems to have been interviewed by INS that same day, see Compl., ¶ 15, but his family never received notification of the resolution of his application. Id., ¶ 16.  Once Garcia reached the age of majority in 1990, he filed a second Form I-485A application, on November 19, 1990.  Id.; see also Notice, Exh. 10 (I-485A Application (Nov. 19, 1990)).  While his 1981 application omitted the date and location of his arrival in the United States, his 1990 application suggests he arrived in Miami, Florida, by boat on August 11, 1980. See I-485A Application (Nov. 19, 1990) at 1.  At no time either before the filing of his 1990 application or during its adjudication does Plaintiff suggest he or his mother ever inquired into the status of the 1981 application.

This was only the beginning of Garcia's interactions with federal agencies.  Six months after he filed his 1990 application, Plaintiff was convicted on May 31, 1991, of distribution and possession with intent to distribute more than 500 grams of cocaine.  See Notice, Exh. 11 (Order to Show Cause and Notice of Hearing (Nov. 21, 1995)) at 6; id., Exh. 7 (Decision of Immigration Judge (Jan. 23, 1996)) at 2.  Around that same time, his status was adjusted to that of lawful permanent resident by INS.  To the Court's initial confusion, Plaintiff's pleadings never specify the date this adjustment took place, and the record evidence and Defendants' briefings contradict themselves as to whether it occurred on April 19, 1991, or April 19, 1992.[1]  Because the Memorandum of Creation of Record of Lawful Permanent Residence for Plaintiff is dated April

---

[1] In Defendants' Combined Motion to Dismiss and Motion for Summary Judgment, they state that Plaintiff's I-485A application was granted on April 19, 1991, see MTD/MSJ at 4, although they point to the date of April 19, 1992, in their Reply.  See Reply at 19.  Other documents including the 1995 Order to Show Cause and the 1996 Decision of Immigration Judge, also use the April 19, 1992, date.

19, 1991, in multiple places on the document, and because that document is the official record of

his adjustment of status, the Court will assume the 1991 date is accurate.  See Notice, Exh. 12

(Memorandum of Creation of Record of Lawful Permanent Residence).  In any case, at the time

his status was adjusted, it was also made administratively retroactive to January 1, 1982, a fact

the parties do agree on.  Id.; see also Compl., ¶ 16; Reply at 19.  Absent any other explanation,

the retroactive status appears to have been made in recognition of his earlier – and then-

outstanding – 1981 application.

Plaintiff's honeymoon with LPR status did not last long, however.  In 1995, he was

issued an Order to Show Cause and Notice of Hearing, in which he was informed that he was

subject to deportation under several provisions of the Immigration and Naturalization Act.  See

Order to Show Cause.  The grounds for his deportation included his involvement with illegal

drug trafficking, his conviction related to a controlled substance, and the procurement of

immigration benefits (his LPR status) based on fraudulent or willful misrepresentation by

attesting in his 1990 application that he was not then involved in drug trafficking or narcotics

distribution.  Id. at 3, 6.

The subsequent events are legally complicated, but reciting them with precision is critical

to the disposition of Plaintiff's case.  At his January 4, 1996, hearing on the issue of deportation,

Garcia admitted all of the allegations of fact contained in the Order to Show Cause, and he was

consequently found to be "deportable as charged."  See Decision of Immigration Judge at 2.

Although both the parties' briefs and the documentary record fail to establish this, the parties

appear to agree that Garcia's LPR status was terminated as a result of the immigration judge's

order that he be deported.  See Compl., ¶ 16; Defendants' Statement of Material Facts (ECF No.

11-2) at 7.  At a minimum, the case law supports this conclusion.  See Matter of Lok, 18 I. & N.

Dec. 101, 101 (BIA 1981) ("The lawful permanent resident status of an alien terminates within the meaning of section 101(a)(20) of the Immigration and Nationality Act, 8 U.S.C. 1101(a)(20), with the entry of a final administrative order of deportation . . . ."); Rivera v. I.N.S., 810 F.2d 540, 541 (5th Cir. 1987) (applying Matter of Lok); see also United States v. Yakou, 428 F.3d 241, 248 (D.C. Cir. 2005).  The Court, accordingly, proceeds under the assumption that at the present moment Garcia no longer has LPR status.

What happened next involves considerable legal time travel, given the changing and fluid nature of this country's immigration laws.  Having been ordered deportable, Garcia applied for a discretionary waiver from deportation under § 212(c) of the INA (then codified as amended at 8 U.S.C. § 1182(c), and since repealed).  See Decision of Immigration Judge at 2.  Confusingly, at the time Garcia applied, the plain text of § 212(c) suggested such a waiver was available only in instances of exclusion proceedings – that is, when an LPR who had left the country returned and was denied re-entry.  See 8 U.S.C. §§ 1182(a), (c), repealed by Omnibus Consolidated Appropriations Act, 1997, Pub. L. 104-208, § 304(b), 110 Stat. 3009, 3009-597 (Sept. 30, 1996) (setting out conditions under which "excludable aliens . . . shall be excluded from admission into the United States").  The parties do not provide any evidence suggesting Garcia entered exclusion proceedings after returning from abroad, and the address listed in his 1995 order to show cause, as well as that listed in the immigration judge's 1996 decision, suggest he was incarcerated at the time he applied for the waiver.  See Order to Show Cause at 1 (listing Plaintiff's address as "Avoyelles Parish Jail" in Marksville, LA); Decision of Immigration Judge at 1 (same).  At first blush, then, Garcia's seeking a § 212(c) exclusion waiver would seem to have been improper.

The Court presumes that the reason Garcia sought such a waiver is that at the time

(1996), the relevant statute – 8 U.S.C. § 1182(c) – granted immigration judges considerably more

discretion in waiving deportation or exclusion orders than did the equivalent waiver for aliens

ordered deported from within the United States, then known as a § 244 waiver (since moved to

§ 237 of the INA and re-codified as amended at 8 U.S.C. § 1227).  See Zamora-Mallari v.

Mukasey, 514 F.3d 679, 683-86 (7th Cir. 2008) (providing extensive history of applicability of

§ 212(c) waivers).  Indeed, after the Second Circuit in 1976 found that such difference in

treatment between those ordered deportable and those ordered excludable was arbitrary and in

violation of the Equal Protection Clause, see Francis v. INS, 532 F.2d 268, 273 (2d Cir. 1976),

the Board of Immigration Appeals (BIA) began to permit "immigration courts throughout the

country [to] consider[] § 212(c) waiver requests from lawful permanent residents in deportation

proceedings where the permanent resident aliens were similarly situated to those in exclusion

proceedings." Zamora-Mallari, 514 F.3d at 685 (citing Matter of Silva, 16 I & N. Dec. 26)

(emphasis added).

The Court thus assumes that this is why Garcia's immigration judge entertained his

§ 212(c) waiver absent any evidence of his having been found excludable.  While § 212(c) has

since been repealed in its entirety, see § 304(b), 110 Stat. at 3009-597, at that time it functioned

to grant the Attorney General broad discretion to waive an order of deportation for aliens who

satisfied two conditions: first, they were "lawfully permitted for permanent residence," and

second, they had "unrelinquished domicile of seven consecutive years" in the United States.  See

id.; see also Decision of Immigration Judge at 2.  Garcia's judge denied his waiver application

for failure to satisfy the first condition.  He held that "respondent was not 'lawfully' admitted for

permanent residence because he obtained his adjustment of status by fraud and the willful

misrepresentation of a material fact.'"  Decision of Immigration Judge at 2.  The fraud, as Garcia

acknowledges, was that he had "willfully failed to disclose his drug trafficking activities during

the course of his adjustment of status," which would have rendered him "ineligible for

adjustment of status due to section 212(a)(2)(C) . . . ."  Id.; see also Compl., ¶ 16; I-485A

Application (Nov. 11, 1990) at 3-4.  In 1996, INA Section 212(a)(2)(C), then codified at 8

U.S.C. § 1182, deemed excludable "[a]ny alien who the consular or immigration officer knows

or has reason to believe is or has been an illicit trafficker in any such controlled substance or is

or has been a knowing assister, abettor, conspirator, or colluder with others in the illicit

trafficking in any such controlled substance . . . ."  § 212(a)(2)(C) (amended 1996).  Although

the immigration judge ordered that Garcia be removed from the country, his Cuban citizenship

presumably blocked INS from carrying out his removal, and so Plaintiff was instead placed

under an order of supervision on June 11, 1998, see Compl., ¶ 16, a status that he has apparently

retained ever since.  Apart from an apparent 2004 FOIA request for documents related to his

immigration file, see Response, Exh. 2 (USCIS FOIA Correspondence (Sept. 13, 2004)),

Plaintiff appears to have made no objection to either his deportability or the revocation of his

LPR status in the intervening years.

So what has changed to motivate his suit today, nearly 20 years later?  Although his

Complaint does not say so, the recent reestablishment of diplomatic relations between Cuba and

the United States – and the concomitant threat of deportation – is a likely catalyst.  In any event,

Garcia here does not challenge anything related to the adjudication of his second (and successful)

1990 I-485A application for adjustment of status to LPR.  Instead, he claims that had the 1981 I-

485A application been adjudicated "in 1981, [he] could have sought relief under [§ 212(c)] to

preserve his lawful permanent residence status at his deportation hearing."  Compl., ¶ 16.  That

date is crucial because if he had achieved permanent-resident status in 1981, it would have

preceded his participation in criminal activities related to cocaine trafficking.  He therefore

would not have had to commit fraud or misrepresentation by lying about his criminal activities in

order to qualify for LPR status during his 1981 adjustment-of-status process.  Absent the fraud or

misrepresentation, in turn, he may have been eligible to do the time warp again and apply for the

discretionary § 212(c) waiver denied him in 1996, which could curtail his 1995 deportation

order.

   B. <u>FOIA Request</u>

   To complicate matters still further, Plaintiff does not know what actually happened with

his 1981 application.  That mystery, in turn, led to a 2013 FOIA request, in which he sought a

"complete copy of [his] Alien File (A-File)," the official record of all immigration transactions

involving Garcia.  <u>See</u> MTD/MSJ at 5 (quoting Notice (ECF No. 13), Exh. 1 (Decl. of Jill A.

Eggleston), ¶ 8).  Upon receipt of his request, USCIS conducted a computerized search and

located Plaintiff's physical A-File, which it then scanned and reviewed.  <u>Id.</u>  On August 30,

2013, USCIS informed Garcia it had identified 419 pages responsive to his request; 263 were

released in their entirety, 15 were released in part, and 5 were withheld in full.  <u>See</u> Compl., ¶ 17.

The balance of pages (136) originated with other federal agencies, and so USCIS referred 8 to

the Federal Bureau of Prisons and 128 to Immigration and Customs Enforcement for their own

responses.  <u>Id.</u>; <u>see also</u> MTD/MSJ at 5-6.

   Among the responsive documents in his A-File that USCIS released was a copy of the

1981 I-485A application, but no documentation demonstrating whether or how that application

had been resolved.  <u>See</u> Compl., ¶ 17.  BOP eventually released all 8 pages in their entirety to

Garcia, while ICE produced 54 pages in full and 74 pages in part.  <u>See</u> MTD/MSJ at 6.  There is

no evidence that Plaintiff filed an administrative appeal concerning the withholdings and exemptions asserted by ICE.  Id.

Plaintiff did file an administrative appeal with USCIS on October 8, 2013, however, arguing that "a reasonably conducted search would have revealed the ultimate disposition of" his case.  See Compl., ¶ 17.  USCIS in response released 3 additional pages, all entirely redacted but for the heading "Supplemental Release" and the page numbers.  Id.  Still dissatisfied, Garcia sought mediation by the Office of Government Information Services (OGIS), the federal FOIA Ombudsman that mediates disputes between FOIA requesters and federal agencies.  Id., ¶ 18; Notice, Exh. 4 (OGIS Letter).  On September 4, 2014, OGIS concluded the mediation without being able to assist Plaintiff in finding any record of an adjudication of his 1981 application.  Id., ¶ 18; see also OGIS Letter.

C.  Federal Lawsuit

Frustrated by his inability both to uncover what happened to his 1981 I-485A application and to forestall deportation, Plaintiff brought this suit against USCIS, Léon Rodríguez in his official capacity as Director of USCIS, and Jeh Johnson in his official capacity as Secretary of the Department of Homeland Security, the federal agency within which USCIS is housed. Garcia claims that USCIS has fallen short in one of its duties: either it has not satisfied its FOIA obligations to perform an adequate search for responsive documents, see Compl., ¶¶ 19-22, or, if no records exist, it has failed to fulfill its responsibility to adjudicate his 1981 I-485A application in a reasonable time.  Id., ¶¶ 23-26.  Plaintiff thus seeks relief under FOIA regarding records of his unresolved I-485A application, id., ¶ 5, and, in the alternative, he brings causes of action arising under the INA, the APA, and the federal mandamus provision to have this Court compel USCIS to adjudicate his 1981 application.  Id., ¶¶ 5-8.

Defendants respond with a combined Motion for Summary Judgment and Motion to Dismiss.  Under the former, they seek judgment on Garcia's FOIA claim, arguing that they have "satisfied all of their statutory obligations under the FOIA to conduct a reasonable search and produce all" relevant and non-exempt documents.  See MTD/MSJ at 1.  Under the latter, Defendants maintain that the Court lacks subject-matter jurisdiction over – and Plaintiff has failed to state a claim for relief on – the non-adjudication of his 1981 I-485A application.  Id.  The Court deals with each in turn.

Before doing so, it notes that a full month after Defendants filed their Reply, Plaintiff moved for leave to file a Sur-Reply.  See ECF No. 20.  Although this appears untimely, and Defendants oppose it, see ECF No. 22, the Court will nonetheless grant it and consider the arguments raised therein where relevant.

## II.     FOIA Claim

### A.  Legal Standard

Defendants here move for summary judgment on Plaintiff's FOIA claim, which may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact is one that would change the outcome of the litigation.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party.  See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).  Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits his own affidavits,

declarations, or documentary evidence to the contrary.  Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Defenders of Wildlife v. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Bigwood v. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007).  In FOIA cases, the agency bears the ultimate burden of proof.  See Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142, n.3 (1989).  The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).  Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'"  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

Congress enacted the Freedom of Information Act in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted).  The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person."

5 U.S.C. § 552(a)(3)(A).  Consistent with this statutory mandate, federal courts have jurisdiction

to order the production of records that an agency improperly withholds.  See 5 U.S.C.

§ 552(a)(3); Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755

(1989).

"Unlike the review of other agency action that must be upheld if supported by substantial

evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to

sustain its action' and directs the district courts to 'determine the matter de novo.'"  Reporters

Comm., 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)).  "At all times courts must bear in

mind that FOIA mandates a 'strong presumption in favor of disclosure' . . . ."  Nat'l Ass'n of

Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of State v. Ray, 502

U.S. 164, 173 (1991)).

B.  Merits

Garcia's only proper FOIA challenge is that USCIS failed to perform an adequate search

for responsive documents.  See Compl., ¶¶ 19-22.  In such a circumstance, "[a]n agency fulfills

its obligations under FOIA if it can demonstrate beyond material doubt that its search was

'reasonably calculated to uncover all relevant documents.'"  Valencia-Lucena v. Coast Guard,

180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C.

Cir. 1990)); see also Steinberg v. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994).  "[T]he

issue to be resolved is not whether there might exist any other documents possibly responsive to

the request, but rather whether the search for those documents was adequate."  Weisberg v. Dep't

of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

The adequacy of an agency's search for documents requested under FOIA "is judged by a

standard of reasonableness and depends, not surprisingly, upon the facts of each case."  Id.  To

meet its burden, the agency may submit affidavits or declarations that explain the scope and method of its search "in reasonable detail." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982) (*per curiam*).  The affidavits or declarations should "set[] forth the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials (if such records exist) were searched." Oglesby v. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  Absent contrary evidence, such affidavits or declarations are sufficient to show that an agency complied with FOIA.  See Block, 684 F.2d at 127.  "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." Truitt, 897 F.2d at 542.

The undisputed facts in this case show that on July 30, 2013, Garcia submitted a FOIA request to USCIS for a "complete copy of Plaintiff's Alien File (A-File)," which is "the official government record that contains information regarding transactions involving an individual as he/she passes through the U.S. immigration and inspection process." Eggleston Decl., ¶¶ 8, 10 n.2; see also 76 Fed. Reg. 34,233, 34,234 (June 13, 2011) (describing A-File recordkeeping system).  As explained above, USCIS located the file, scanned it, identified 419 pages of responsive materials, and released the vast majority to Plaintiff.  Garcia here challenges neither the referral of certain of these records to other agencies nor the specific exemptions USCIS and ICE relied on in withholding certain documents.

Instead, Plaintiff's claim relates solely to the adequacy of the search.  See Compl. at 8. He remains convinced that USCIS has not conducted a thorough search for responsive documents because among the documents the agency released to Garcia was his 1981 Form I-485A Application, dated October 19, 1981, and stamped "UP-FRONT PROCESSED," "indicating that Mr. Garcia was interviewed in connection with the application."  Eggleston

Decl., Exh. D (FOIA Appeal (October 8, 2013)) at 1.  Yet "the 278 pages released by USCIS

contain no indication of adjudication of the application."  Id.  Plaintiff thus contends that a

"reasonably conducted search would have revealed the ultimate disposition of Plaintiff Garcia's

application."  Compl., ¶ 17.

    In so arguing, Plaintiff heavily relies on an apparent disparity between the assertions of

USCIS, the agency that initially handled his FOIA request, and OGIS, the agency to which he

appealed USCIS's FOIA productions.  OGIS informed Plaintiff in a September 4, 2014, letter

that it had conducted an inquiry with USCIS and had confirmed both that the original search

determined that "the A-file did not contain the Form I-485A," and that "USCIS ran another

search and did not locate any documents responsive to [Plaintiff's] request, including Mr.

Garcia's Form I-485A."  OGIS Letter at 2.  Plaintiff explains that "OGIS's statement that the

Form I-485A was not found in the A-file" is not true because "the Form I-485A was contained in

the A-file" that USCIS initially provided him.  See Compl., ¶ 20.  This error must manifest an

inadequate search, he posits.  Defendants' explanation for this disparity is that OGIS misspoke:

> Given the other language of the letter, and letter's acknowledgement
> that counsel's request for review was only concerned with "the
> disposition of the Form I-485A filed on behalf of [Plaintiff]," see
> Exhibit _ [sic] at p. 2, it is far more likely that OGIS was stating that
> a Form I-485A with approval was not located."

MTD/MSJ at 7 n.3.

    Whether this reasonable explanation is true or not, OGIS has no independent access to

the underlying records in question; "OGIS has no investigatory or enforcement power, nor can

[it] compel an agency to release documents.  OGIS serves as the Federal FOIA Ombudsman and

[its] jurisdiction is limited to assisting with the FOIA process."  OGIS Letter at 1.  Whatever

records OGIS reviewed, then, are the same records USCIS reviewed – and the same ones USCIS

either provided to Plaintiff or withheld under a FOIA exemption.  And as shown by USCIS's

Vaughn Index – the document that provides a description of each partially or fully withheld page

and the exemption claimed for such withholding – none of the 18 pages withheld in part or 2

pages withheld in full is a document related to the ultimate disposition of Plaintiff's 1981 I-485A

application.  See Eggleston Decl., Exh. G (Vaughn Index).  OGIS's statement thus has no

bearing on whether USCIS fulfilled its legal obligations under FOIA.

At bottom, what USCIS must demonstrate "beyond material doubt is that it has

conducted a search reasonably calculated to uncover all relevant documents."  Weisberg v. Dep't

of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  The Court believes it has.  Plaintiff requested

his "Complete Alien File (A-File)" and provided his Alien Registration Number and date of birth

to assist in the production of this A-File.  As USCIS explains, "USCIS is the custodian of all A-

Files, including Plaintiff's A-File.  All official records generated or held by U.S. immigration

authorities . . . [should] be consolidated in the A-File, maintained under and retrievable by

reference to Plaintiff's name and Alien number, and date of birth, or combination thereof."

Eggleston Decl., ¶ 10 n.2.  The National Records Center, a unit of USCIS, "conducted a

computerized database search in the National File Tracking System (NFTS) database [the

database that records and tracks the location of A-files] using the information that was provided

in the Plaintiff's FOIA request and located an A-File bearing the Plaintiff's name and A-

number."  Id., ¶ 11.  Because all documents related to an alien's immigration transactions

"should, as a matter of course, be consolidated in the A-File," there is no reason to doubt that any

extant files related to Plaintiff's 1981 I-485A application were included in his A-File, and

Plaintiff has provided no evidence to suggest otherwise.  Id., ¶ 10 n.2.

Garcia puts forward two additional arguments for the inadequacy of USCIS's search in his Response, but each falls equally short. First, he contends that the agency searched only for the paper copy of his A-File, not a possible electronic copy. See Response at 5-6. As Defendants explain in their Reply, however, not all A-Files are digitized. See Reply at 7 (citing Notice of Update and Reissuance of Privacy Act System of Records, 78 Fed. Reg. 69,864 (Nov. 21, 2013)). Indeed, when USCIS searched the NFTS database for Plaintiff's A-File, it obtained the physical location of the file, and there was no indication it had been digitized; had it been, "the results of the search inquiry would have been reflected in bold, red print that the file had been digitized." Id. at 7 (citing Reply, Exh. 13 (Declaration of Brian J. Welsh), ¶ 9); see also Welsh Decl., Exh. 3 (NFTS Query Screenshot). Even if Plaintiff's A-File had been digitized, Defendants aver, the electronic copy would "either be identical to the paper A-File, or would contain even less material than the paper A-File . . . ." Reply at 7 (citing 78 Fed. Reg. at 69,864).

Plaintiff also raises concerns about other possibly missing documents, including any potential contents of his T-File – a temporary file – and the scan of the "hard jacket cover" folder of his A-File. See Response at 6. Defendants respond that if a T-File existed for Plaintiff, USCIS's search for his A-File would have yielded it, because when an A-File is created, documents in the T-File are permanently consolidated into it. See Welsh Decl., ¶ 5. As to the "hard jacket cover," it was not scanned initially because such jackets are scanned only if they "contain[] substantive information . . . ." Id., ¶ 11; see also Reply at 8-9. It was subsequently released, however, and inspection of the document confirms that it yields no substantive information. See Reply, Exh. 14 (File Folder).

The Court thus concludes that USCIS has conducted an adequate search. After all, "the relevant issue 'is not whether there might exist any other documents possibly responsive to the

request, but rather whether the <u>search</u> for those documents was <u>adequate</u>.'" <u>Schrecker v. U.S.</u>

<u>Dep't of Justice</u>, 349 F.3d 657, 662 (D.C. Cir. 2003) (quoting <u>Weisberg</u>, 745 F.2d at 1485).

Plaintiff's FOIA request specifically sought only his A-File, <u>see</u> Eggleston Decl., Exh. A (Form

G-639 FOIA Request) at 1, which USCIS provided, and he cannot now – on appeal – seek to

expand his search beyond that.  Without evidence to suggest that other documents definitely

exist in digitized form, and without a FOIA request seeking records located somewhere <u>other</u>

<u>than</u> in his A-File, the Court believes USCIS satisfied its statutory responsibility under FOIA to

search for and provide responsive records.

     One other note.  Plaintiff also seeks *in camera* review of agency records, arguing that

inconsistencies in what USCIS has released suggests that it is holding something back.  <u>See</u>

Response at 8-9.  The parties trade arguments as to whether Garcia failed to exhaust

administratively his *in camera* request in his FOIA agency appeal.  <u>See</u> Reply 12-13; Sur-Reply

at 1-8.  Yet the Court need not resolve this dispute because a larger problem emerges: Plaintiff

has never claimed that documents specified in the <u>Vaughn</u> Index were improperly withheld

under particular FOIA exemptions.  Instead, Count I of his Complaint is titled "The USCIS

Failed to Perform an Adequate Search for Responsive Documents."  Compl. at 8.  He

nonetheless now seeks blanket *in camera* review of "<u>all</u> agency records."  Response at 8

(emphasis added).  This is plainly not how *in camera* review should be entertained in the context

of FOIA.  Rather, such review is only appropriate where a litigant properly challenges specific

<u>exemptions</u> used to justify withholdings, something Plaintiff has not done here.  <u>See</u> <u>Ray v.</u>

<u>Turner</u>, 587 F.2d 1187, 1195 (D.C. Cir. 1978) (holding that *in camera* inspection is appropriate

where district court must independently evaluate agency's claims of exemption); <u>Juarez v. Dep't</u>

<u>of Justice</u>, 518 F.3d 54, 60 (D.C. Cir. 2008).

Garcia instead simply recites documents he would like – *e.g.*, "electronic files maintained about the plaintiff" and any documents anywhere located that relate to his 1981 I-485A application – ignoring Defendants' answers that such documents could not be found in the places he asked to be searched.  See Reply at 8 ("[T]he Agency's review of Plaintiff's paper A-File was . . . the <u>only</u> search that USCIS could have performed because no digitized file existed."). Whether or not Garcia has failed to exhaust his administrative remedies, then, he has not put forward specific challenges to USCIS's withholding exemptions concerning individual records, and so the Court has no basis upon which to consider *in camera* review, a remedy squarely within its discretion to grant.  See <u>Juarez</u>, 518 F.3d at 60 (noting that district court "acts within its 'broad discretion' by declining to conduct such [*in camera*] review") (citation omitted).

The Court consequently holds that whether or not Plaintiff's I-485A application was actually adjudicated, summary judgment will be entered for Defendants on Plaintiff's FOIA cause of action alleging inadequate search.

## III.   Duty to Adjudicate 1981 Application

Assuming, then, that no document exists indicating that a decision on Garcia's 1981 application was ever rendered, the Court next turns to his claims concerning the application itself.  To reiterate, Plaintiff seeks a Court order requiring USCIS to adjudicate his 1981 I-485A application under the facts and law as they existed in that year.  See Compl. at 9-10.  Garcia brings causes of action arising under the INA itself, the APA, and the statutory mandamus provision.  <u>Id.</u>, ¶¶ 5-8.  As to the first of these, Plaintiff asserts that the INA, 8 U.S.C. § 1103, imposes on USCIS a "duty to adjudicate applications for adjustment status within a reasonable time," <u>id.</u>, ¶ 8, something he believes the agency has not done with his 1981 I-485A application. <u>Id.</u>, ¶ 4.  Second, Garcia relies on the APA, which "empowers district courts to 'compel agency

action unlawfully withheld or unreasonably delayed.'"  Id., ¶ 6 (quoting 5 U.S.C. § 706(1)).

Finally, he alleges a claim under the federal mandamus provision, which grants federal district

courts original jurisdiction over "'any action in the nature of mandamus.'"  Id., ¶ 7 (quoting 28

U.S.C. § 1361).  As the Court decides this issue on jurisdictional grounds, it sets forth that legal

standard before proceeding to its analysis.

    A.  Legal Standard

In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's

factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be

derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C.

Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation

omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Importantly, this standard governs the Court's considerations of Defendants' contentions under

both Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)

("[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the

subject matter or for failure to state a cause of action, the allegations of the complaint should be

construed favorably to the pleader.");  Walker v. Jones, 733 F.2d 923, 925–26 (D.C. Cir. 1984)

(same).  The Court need not accept as true, however, "a legal conclusion couched as a factual

allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v.

Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff bears the burden of

proving that the Court has subject-matter jurisdiction to hear his claims.  See DaimlerChrysler

Corp. v. Cuno, 547 U.S. 332, 342 & n.3 (2006); Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir.

2015).  A court has an "affirmative obligation to ensure that it is acting within the scope of its

jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1350 (2d ed. 1987)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction. . . ." Jerome Stevens Pharm., 402 F.3d at 1253.

B.  Jurisdiction

In seeking dismissal here, Defendants raise a host of jurisdictional arguments, but the Court need only address the first, which concerns standing.  See Am. Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C. Cir. 2005) (noting that Article III standing is a prerequisite to federal-court jurisdiction).  After examining the precepts relating to standing and mootness, it will apply them to Plaintiff's claims, finding that he lacks standing.

1.  *Standing and Mootness*

Defendants' first line of defense relates to Garcia's ability to maintain his lawsuit altogether: they argue that "Plaintiff's immigration-related claim became moot when, on April 19, 1991, USCIS's predecessor organization (the INS) adjudicated Plaintiff's 1990 I-485 Application." MTD/MSJ at 24.  While they are correct in stating that where "the relief a plaintiff seeks has already been obtained, a federal court must dismiss the action as moot," id., the Court believes the circumstances of this case are more properly characterized as issues of standing rather than mootness.

The two concepts are "inter-related judicial doctrines" that "ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies.'" Worth v. Jackson, 451 F.3d 854, 855

(D.C. Cir. 2006) (quoting U.S. CONST. art. III, § 2, cl. 1.).  While similar in their functions, standing and mootness are distinguished by the question of timing.  See Garden State Broad. Ltd. Partnership v. FCC, 996 F.2d 386, 394 (D.C. Cir. 1993) ("Mootness and standing are related concepts. The Supreme Court has characterized mootness as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'") (quoting U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)); see also Judicial Watch, Inc. v. Kerry, No. 15-785, 2016 WL 126349, at *3 (D.D.C. Jan. 11, 2016).

Given that both doctrines implicate the need for a plaintiff to demonstrate he has standing, the Court will briefly recite the constitutionally required tripartite standard.  First, he "must have suffered an injury in fact – an invasion of a legally-protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . ." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).  Second, "there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Id. (citation and internal quotation marks omitted).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Id. at 561 (citation omitted).  A "deficiency on any one of the three prongs suffices to defeat standing . . . ."  U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

As stated above, whereas a standing inquiry is concerned with the presence of injury, causation, and redressability at the time a complaint is filed, a mootness inquiry scrutinizes the presence of these elements after filing – i.e., at the time of a court's decision.  See La Botz v.

Fed. Election Comm'n, 61 F. Supp. 3d 21, 28 (D.D.C. 2014) ("Whether a plaintiff has standing is determined at the time the suit commences.  Thus, standing in the present action is ascertained from the facts as they existed when [Plaintiff] first filed his complaint in this Court.") (citations omitted); 13B Wright & Miller, Fed. Prac. & Proc. § 3533 (3d ed. 1998) ("Mootness doctrine encompasses the circumstances that destroy the justiciability of a suit previously suitable for determination.  It is not enough that the initial requirements of standing and ripeness have been satisfied; the suit must remain alive throughout the course of litigation . . . .") (emphasis added).

In light of this distinction, the Court finds USCIS's defense is more properly construed as one of standing rather than mootness, inasmuch as Garcia's 1990 application was processed on April 19, 1991, long before he filed his federal lawsuit seeking to have his 1981 application adjudicated.  See Compl. (filed May 18, 2015).  Neither his legal status nor the status of his 1981 application appears to have changed since he initiated suit.  Since the alleged actions that "moot" Plaintiff's claim all took place before he brought his lawsuit, therefore, Defendants' justiciability argument is better characterized as one of standing.  See Advanced Mgmt. Tech., Inc. v. FAA, 211 F.3d 633, 636 (D.C. Cir. 2000) ("The claim may sound like one of mootness – a justiciable controversy existed but no longer remains – but the timing makes [Plaintiff's] problem one of standing. . . .  Standing is assessed at the time the action commences, i.e., in this case, at the time [Plaintiff] sought relief from an Article III court. . . .") (internal quotation marks and citation omitted) (emphasis added).  As a threshold matter, then, Garcia must establish standing at the time he filed in order to pursue his causes of action under the INA, the APA, and the statutory mandamus provision.

2. *Injury and Redressability*

The thrust of Defendants' justiciability argument is that Plaintiff has no cognizable injury because an I-485A application for his adjustment of status to LPR has <u>already</u> been adjudicated. <u>See</u> MTD/MSJ at 24.  They contend that the adjudication of his 1990 application vitiated any remaining need he had for adjudication of the earlier 1981 application.  <u>Id.</u> at 25 ("Here, there is no action left to perform because the 1981 I-485 Application became moot at the very moment the INS issued a decision on Plaintiff's subsequent I-485 Application [in 1991].").  In other words, because the relief he sought in his 1981 application was the relief he actually received from his 1990 application – albeit short-lived – there is nothing left for the Court to do. Bolstering this position is the fact that when INS adjusted Garcia's status to that of LPR in 1991, it made this adjustment retroactive to January 1, 1982.  <u>See</u> MTD/MSJ at 4; Decision of Immigration Judge at 2.  There would be no reason – and Plaintiff has offered none – for his 1990 application to warrant retroactive adjustment to that date unless INS had credited the fact of his previous 1981 application.  <u>See</u> Compl., ¶ 6.

Plaintiff's alleged injury, in fact, is more nuanced than the mere lack of a hearing on an I-485A application.  He pleads that

> [i]f [his] application filed in 1981 had been adjudicated within a reasonable time, it would have been adjudicated when he was clearly eligible for the adjustment and before his disqualifying criminal activity in 1990. In deportation proceedings as a permanent resident, Mr. Garcia would have been eligible to seek relief under [§ 212(c)] to avoid a deportation order.

<u>Id.</u>, ¶ 25.  In other words, INS's <u>delay</u> on his 1981 application caused him harm because it ultimately deprived him of subsequent eligibility for a discretionary § 212(c) waiver today.  But his injury consists of more than INS's failure to adjudicate his 1981 application; after all, a grant

of LPR status would not by itself cancel his order of deportation.  Such LPR status must also be accompanied by a grant of the discretionary § 212(c) waiver for Garcia to avoid deportation.

Given this more specific harm that Plaintiff alleges, the Court believes his standing problem is better articulated as one of <u>redressability</u> rather than one of injury.  Garcia's ultimate harm – his looming deportation – cannot be avoided unless he obtains a § 212(c) waiver, and he needs the Court's help in getting it.  Absent an eventual grant of such waiver, the mere adjudication of his 1981 application would not alter his status as deportable.  At the end of the day, however, since the Court cannot force USCIS to provide the relief Plaintiff seeks – it can only offer him an outside chance – it cannot redress his injury.  The Court now explains how far-flung Plaintiff's theory of relief is because "it must be likely, as opposed to merely speculative, that [his] injury will be redressed by a favorable decision." <u>Lujan</u>, 504 U.S. at 561 (citation and internal quotation marks omitted).

Preliminarily, there is no guarantee that his 1981 application would yield a successful adjustment of status to LPR; for any number of reasons, USCIS could deny it.  No applicant is assured adjustment of status, and this Court has no power to order USCIS to issue it, given the lack of jurisdiction federal courts have over all discretionary decisions made by the Attorney General and the Secretary of Homeland Security concerning immigration status matters.  <u>See</u> 8 U.S.C. § 1252(a)(2)(B) ("[N]o court shall have jurisdiction to review-- (i) any judgment regarding the granting of relief under section . . . 1255 of this title ["Adjustment of status of nonimmigrant to that of person admitted for permanent residence"], or (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security . . . for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .").

Even if Garcia did obtain adjustment of status to LPR, furthermore, that would not get him across home plate.  He would still need his order of deportation nullified via the § 212(c) waiver.  Like adjustments of status, waivers from deportation under § 212(c) were granted discretionarily.  Even if an immigration judge finds that Plaintiff has lawfully obtained his permanent-resident status – and therefore is at least not ineligible for a § 212(c) waiver on that basis – there is no guarantee she would grant him the waiver on the equities.  And without it, Garcia remains deportable.  This discretion renders too speculative the possibility that the relief Plaintiff can obtain here will redress the injury he has suffered, as he has not established any reason to believe he would be successful in obtaining the waiver.

For § 212(c) waivers, "[t]he burden [was] on the applicant to establish that a grant of a waiver . . . [was] warranted in the exercise of discretion," In Re Mendez-Moralez, 21 I. & N. Dec. 296, 299 (BIA 1996), since § 212(c) waivers involved equitable balancing.  See Vargas-Hernandez v. Gonzales, 497 F.3d 919, 927 (9th Cir. 2007).  Equitable factors the BIA considered in weighing a § 212(c) applicant's case included "the nature and underlying circumstances of the . . . deportation ground at issue," "the existence, seriousness, and recency of any criminal record," and "evidence of bad character."  Yepes-Prado v. INS, 10 F.3d 1363, 1366 (9th Cir. 1993) (citing Matter of Edwards, 20 I. & N. Dec. 191 (BIA 1990)).

The Court is doubtful – given Plaintiff's previous record of fraudulent and misleading behavior, coupled with his criminal conviction for drug trafficking – that an immigration judge would grant such discretionary relief.  Plaintiff himself has not alleged that such judge could turn a blind eye to his cocaine-trafficking conviction and his previous mistruths in his 1990 I-485A application.  The Court thus does not find it likely that the order he asks for – adjudication of his 1981 application – would ultimately remediate the harm he seeks to prevent – viz., his

deportation.  As such, Plaintiff has not stated an injury redressable by the Court and thus cannot establish that he has standing to bring this suit.

3.  Nunc Pro Tunc

Garcia faces yet another roadblock in seeking to establish the redressability of his claim – namely, the extraordinary remedy he seeks from this Court.  He cannot even roll the dice for his longshot discretionary bid unless this Court grants him a far-reaching equitable reprieve in the form of *nunc pro tunc*.  This is because the law and facts as of 2016 preclude Garcia from both applying for and obtaining LPR status as well as seeking and obtaining a § 212(c) waiver.  "*Nunc pro tunc*, Latin for 'now for then,' refers to a court's inherent power to enter an order having retroactive effect."  Iouri v. Ashcroft, 487 F.3d 76, 87 (2d Cir. 2006) (citing Black's Law Dictionary 1100 (8th ed. 2004)).  Although central to his case, Plaintiff barely raised *nunc pro tunc* at all until his untimely Sur-Reply.  See ECF No. 20, Exh. 4 (Sur-Reply) at 15-17.  Given the extensive nature of Garcia's *nunc pro tunc* request, the Court doubts that it even has the power to grant it.  If the Court were so empowered, moreover, it concludes that the equities strongly weight against a grant.

a.  Availability

As a threshold matter, the reach of federal courts to grant *nunc pro tunc* relief in immigration cases is unsettled.  It remains an open question whether federal courts sitting in equity may use *nunc pro tunc* as broadly as the BIA itself does in immigration matters, for outside of the immigration context, *nunc pro tunc* has been an "equitable remedy traditionally used to apply to a court's own [prior] order or judgment retroactively."  Ethyl Corp. v. Browner, 67 F.3d 941, 945 (D.C. Cir. 1995) (emphasis added).  Some courts have concluded that while the BIA may possess broad discretion to use *nunc pro tunc*, courts should exercise it on a more

limited basis.  See Romero-Rodriguez v. Gonzales, 488 F.3d 672, 678-79 (5th Cir. 2007) ("[W]e

do not believe that the courts' *nunc pro tunc* authority is any broader in the context of

immigration law than it is in other contexts.").

Although the D.C. Circuit has not ruled on the propriety of *nunc pro tunc* relief in the

quest for since-repealed § 212(c) waivers, other circuits have split as to the availability of such a

remedy.  Compare Edwards v. I.N.S., 393 F.3d 299, 309 (2d Cir. 2004) ("The BIA has, through

much of § 212(c)'s history, explicitly deemed it appropriate to award § 212(c) waivers *nunc pro*

*tunc*."), with Fernandes Pereira v. Gonzales, 417 F.3d 38, 47 (1st Cir. 2005) (refusing to grant

*nunc pro tunc* relief for plaintiff erroneously denied access to § 212(c) waiver by immigration

judge).  Yet, to be able to seek a § 212 waiver, Plaintiff must first obtain *nunc pro tunc* relief for

adjudication of his 1981 I-485A application.  Such *nunc pro tunc* relief, however, is more than

was authorized in Edwards, which only stated that *nunc pro tunc* orders are appropriate where

they would "return aliens to the position in which they would have been, but for a significant

error in their immigration proceedings."  393 F.3d at 308-09.  In Plaintiff's case, there was no

error in the denial of his § 212(c) waiver, so at best his argument is that USCIS erred in failing to

adjudicate his 1981 I-485A application.

This leads to another problem for Garcia.  As one Circuit put it:

> [T]he instances in which such [*nunc pro tunc*] relief could be granted
> have been limited to those in which the grant would effect a
> complete disposition of the case, i.e., where the only ground of
> deportability or inadmissibility would thereby be eliminated or
> where the alien would receive a grant of adjustment of status in
> conjunction with the grant of any appropriate waivers of
> inadmissibility.

Perez-Gonzalez v. Ashcroft, 379 F.3d 783, 789 (9th Cir. 2004), rev'd on other grounds, Gonzales

v. Dep't of Homeland Sec., 508 F.3d 1227 (9th Cir. 2007) (quoting In Re Garcia-Linares, 21 I. &

N. Dec. 254, 257 (BIA 1996)) (emphasis added) (internal quotation marks omitted).  In other words, in those cases where courts have ordered *nunc pro tunc* relief, such orders granted plaintiffs the <u>complete</u> relief they sought.  <u>See, e.g.</u>, <u>Edwards</u>, 393 F.3d at 304-306 (granting *nunc pro tunc* relief to aliens erroneously denied opportunity to apply for § 212(c) waivers); <u>Snajder v. I.N.S.</u>, 29 F.3d 1203, 1208 (7th Cir. 1994) (granting plaintiff removal hearing *nunc pro tunc* to remedy immigration judge's error in proceeding with hearing without petitioner's attorney present); <u>Batanic v. I.N.S.</u>, 12 F.3d 662, 664, 667-668 (7th Cir. 1993) (granting *nunc pro tunc* relief to alien erroneously denied opportunity to apply for asylum).

Here, by contrast, the error Plaintiff alleges is <u>unrelated</u> to the relief he ultimately seeks.  The error is that USCIS wrongly failed to adjudicate his 1981 I-485A application, but the injury Garcia ultimately seeks to redress is his denial of access to a § 212(c) waiver.  Ordering USCIS to adjudicate the 1981 application *nunc pro tunc* would not "effect a complete disposition" of his claim, <u>see</u> <u>Perez-Gonzalez</u>, 379 F.3d at 789, because even a successful adjustment of status would not guarantee his <u>eligibility</u> for a § 212(c) waiver, let alone success at obtaining it on the merits.  Plaintiff, in fact, may have been ineligible for a § 212(c) waiver for other reasons, such as having served more than five years in prison due to an aggravated felony.  <u>See</u> 8 U.S.C. 1182(c) (1990), <u>repealed by</u> § 304(b), 110 Stat. at 3009-597; <u>Fernandes Pereira</u>, 417 F.3d at 41 (denying plaintiff's claim for § 212(c) *nunc pro tunc* relief to treat plaintiff as having served less than five years in prison).  The *nunc pro tunc* relief Plaintiff asks for is thus different from that sought in those cases in which courts have found such remedy availing.

Given these considerations, the Court does not believe *nunc pro tunc* relief is available to remediate the harm Plaintiff hopes to avoid, and so any order from this Court would do nothing to redress his narrowly alleged injury.

b.   Breadth of Relief Sought

Even assuming the availability of *nunc pro tunc* here, the form of relief Garcia seeks is

exceptionally broad, as he faces several timing-related challenges.  His first hurdle is that, as of

today, he would not even be eligible for adjustment of status to LPR.  While INS did grant him

LPR status in 1991, in his 1990 application he answered "no" to the question of whether "any of

the foregoing classes apply to you," where said classes included "aliens who have been

convicted of violation of any law or regulation relating to narcotic drugs or marihuana, <u>or who

have been illicit traffickers in narcotic drugs or marihuana</u> . . . ."  Notice, Exh. 10 (I-485A

Application (Nov. 19, 1990)) (emphasis added).  He would have to answer "yes" to such a

question today, rendering himself ineligible.  What Plaintiff seeks is therefore even more far-

reaching: that USCIS's adjustment-of-status procedure take place as if it were 1981, before he

participated in the cocaine-trafficking activities and was incarcerated.  Only then could Garcia

<u>lawfully</u> obtain LPR status, doing so before his criminal activities rendered him ineligible.

This remedy is not only extraordinary, but it would also require USCIS to ignore its own

adjustment-of-status procedures.  As Defendants point out in their Reply, DHS's regulations

require that "[a]n application or petitioner must establish that he or she is eligible for the

requested benefit at the time of filing the benefit request and <u>must continue to be eligible through

adjudication</u>."  8 C.F.R. § 103.2(b)(1) (emphasis added); <u>see also</u> Reply at 16.  An "immigration

benefit application" includes "any application or petition to confer, certify, change, <u>adjust</u>, or

extend <u>any status</u> granted under the Immigration and Nationalization Act."  8 U.S.C. § 1572(2)

(emphasis added).  This includes applications to adjust an alien's status to that of permanent

resident.  As a result, even if Garcia were eligible for the immigration benefit – LPR status – as

of the time he filed (in 1981), the regulation requires that he continue to be eligible until the time

the status is granted – *i.e.*, today.  The Court would therefore also have to order USCIS to turn a blind eye to his subsequent criminal activities.

And Garcia's need for *nunc pro tunc* relief does not stop there.  Even if he did obtain LPR status, he would remain ineligible for a § 212(c) waiver today because such waivers no longer exist, having been repealed in 1996.  See 8 U.S.C. 1182(c), repealed by § 304(b), 110 Stat. at 3009-597.  The Court would also have to order USCIS to ignore other 1996 amendments to the INA, see § 304(a), 110 Stat. 3009-594, that render cancellation of removal categorically unavailable to a permanent resident convicted of an aggravated felony.  See 8 U.S.C. § 1229b(a)(3).  Garcia would thus need the Court to order that USCIS consider such a waiver *nunc pro tunc*, as if it were still available today and as if he were still eligible for relief from deportation.

c.   Equities

Even if it were proper for the Court to grant "*nunc pro tunc* relief[, it] 'should be granted or refused[ only] as justice may require.'"  Edwards, 393 F.3d at 310 (quoting Mitchell v. Overman, 103 U.S. 62, 65 (1882)).  Here, the Court does not believe that justice demands rewinding both the law (the availability of the § 212(c) waiver) and the facts (to treat Plaintiff as if he came before USCIS in 1981).  *Nunc pro tunc* is an equitable remedy infrequently granted. See Zhang v. Holder, 617 F.3d 650, 665 (2d Cir. 2010) ("[T]he doctrine of *nunc pro tunc* is a far-reaching equitable remedy applied in certain exceptional cases, typically aimed at rectify[ing] any injustice [to the parties] suffered by them on account of judicial [or agency] delay.") (citations and internal quotation marks omitted).

Plaintiff does not come before this Court with clean hands, a chief consideration in the weighing of equitable remedies.  See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,

324 U.S. 806, 814 (1945) (noting "equitable maxim that 'he who comes into equity must come

with clean hands' . . . closes the doors of a court of equity to one tainted with inequitableness or

bad faith . . . however improper may have been the behavior of the defendant").  Garcia himself

acknowledges that he acted fraudulently or misleadingly in his 1990 adjudication, in which he

claimed LPR eligibility while simultaneously engaging in unlawful cocaine trafficking that

would render him ineligible for such status.  See Decision of Immigration Judge at 2.  It is clear

from his November 19, 1990, I-485A application that he fraudulently checked the "no" box

concerning whether he had participated in violations of the law and in illicit trafficking of

narcotics.  See I-485A Application (Nov. 19, 1990) at 2-3.  The equities do not seem to weigh in

Plaintiff's favor where he seeks to use the Court's power to erase his bad acts from his

immigration record.

   Plaintiff's equitable claim is also weakened by his own delays, limiting his ability to

contend that the injustice arose due only to agency delay.  Cf. Iouri v. Ashcroft, 487 F.3d 76, 87-

89 (2d Cir. 2007) (finding *nunc pro tunc* relief unwarranted where plaintiff's delays contributed

to inability to seek discretionary stay of voluntary departure from BIA).  Here, Garcia has been

under an order of supervision (and potentially deportable) since 1998, a status he has not sought

to alter through adjudication of his 1981 application until now, nearly 20 years later, presumably

because rapidly improving diplomatic relations with Cuba may one day soon make him

deportable.  His 2015 lawsuit is the first documented effort he has made to seek action on his

application filed nearly 35 years ago.  While attached exhibits indicate Plaintiff filed a FOIA

request in 2004 and obtained 387 pages of responsive documents, see USCIS FOIA

Correspondence (Sept. 13, 2004), he never explains why he did not challenge inaction on his

1981 application back then, when he was surely aware of it.

Garcia tries to shift the balance of the equities by arguing that "the fault in failing to adjudicate plaintiff's application lies solely with the defendants," <u>see</u> Sur-Reply at 15, but this is not true.  Plaintiff has not provided any evidence that he or his family ever contacted INS between 1981 and 1990 to determine the status of the 1981 application, or that he raised the issue at his deportation hearing or during his § 212(c) waiver hearing.  Indeed, rather than seek adjudication of his first application in 1990, he effectively abandoned it by applying anew with a second application, obtaining retroactive relief under that later application all the way back to January 1, 1982.  By all accounts, Plaintiff was satisfied with the outcome of his adjustment of status until it was revoked on account of his drug-trafficking activities.  Whatever injury Plaintiff has experienced from the delay on his 1981 application, he appears to have made no effort until this lawsuit to remediate it.  To now come into court decades later and claim injustice seems a stretch.  The weighing of the equities, therefore, tilts decidedly in Defendants' favor.

\* \* \*

When all is said and done, Plaintiff's only hope for relief requires the Court to string together a considerable series of counterfactuals so that Garcia can retroactively obtain LPR status at a time before his drug conviction rendered him ineligible.  To wit, he needs the Court in 2016 to grant him an adjustment of status as if it were 1981, so that he can pursue a waiver that was repealed in 1996 – without being disqualified by unlawful actions he engaged in back in 1990.  And even if the Court did weave such a complex legal rewriting of history, there is no guarantee such a discretionary remedy would be granted to him, particularly given the demonstrable evidence that he has previously been dishonest in seeking adjustment of status and was subsequently convicted of drug trafficking.  Such relief is simply too speculative to maintain standing even if it were warranted on an equitable basis, which the Court concludes it is not.

Because the Court finds that Plaintiff lacks standing to seek relief, it need not tackle the complicated legal arguments as to whether it has jurisdiction under the INA, APA, or federal mandamus provision, nor resolve the statute-of-limitations issues raised by Defendants.  See Am. Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C. Cir. 2005) ("It is . . . well established that Article III standing is a prerequisite to federal court jurisdiction . . . .").

**IV.     Conclusion**

While the Court's path through this country's immigration laws has been tortuous, the outcome is straightforward: no remedy is available to Plaintiff here.  Defendants have demonstrated that they have fulfilled their search obligations on Garcia's FOIA request, and Plaintiff lacks standing to ask this Court to order USCIS to adjudicate his outstanding 1981 I-485A application for adjustment of status.  The Court will, accordingly, issue a contemporaneous Order granting Defendants' Motion to Dismiss and Motion for Summary Judgment.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  March 2, 2016